# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

ATHENA HOWLETT,                                    Case No. 1:10-cv-150
    Plaintiff                                      Barrett, J.
                                                   Litkovitz, M.J.

    vs

COMMISSIONER OF                                    **REPORT AND**
SOCIAL SECURITY,                                   **RECOMMENDATION**
    Defendant

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications

for disability insurance benefits (DIB) and supplemental security income (SSI). This matter is

before the Court on plaintiff's Statement of Errors (Doc. 10), the Commissioner's Memorandum

in Opposition (Doc. 15), and plaintiff's Reply (Doc. 16).

## PROCEDURAL BACKGROUND

Plaintiff, Athena Howlett, was born in 1961 and was 47 years old at the time of the

administrative law judge's (ALJ) decision. Plaintiff has a tenth grade, "limited" education and

past relevant work experience as a dump truck driver, school bus driver and retail cashier.

Plaintiff filed applications for DIB and SSI on March 30, 2006, alleging disability since

August 1, 2001, due to diabetes, high blood pressure, hearing problems and depression. (Tr.

137). Plaintiff's applications were denied initially and upon reconsideration. Plaintiff requested

and was granted a *de novo* hearing before an ALJ. On September 17, 2008, plaintiff, who was

represented by counsel, appeared and testified at a hearing before ALJ Robert W. Flynn. (Tr. 28-

57).  A vocational expert (VE), Janice L. Bending, Ph.D., also appeared and testified at the hearing.  (Tr. 57-66).

On January 15, 2009, the ALJ issued a decision denying plaintiff's DIB and SSI applications.  The ALJ determined that plaintiff suffers from the severe impairments of diabetes, hypertension, history of mild stroke, carpal tunnel syndrome, and depression, but that such impairments do not alone or in combination meet or equal the level of severity described in the Listing of Impairments.  (Tr. 13, 15).  According to the ALJ, plaintiff has the residual functional capacity (RFC) to perform light work, "except that fine manipulation is limited to occasional bilaterally."  (Tr. 16).  The ALJ also found that plaintiff has the RFC for only simple, routine and repetitive tasks in a low-stress work environment, which he defined as being free of fast-paced production requirements and involving only simple work-related decisions with few, if any, workplace changes.  *Id.*  The ALJ found that plaintiff should have only occasional interactions with the public and co-workers.  *Id.*  The ALJ determined that plaintiff's subjective allegations of disability are less than credible.  (Tr. 17).  The ALJ next determined that plaintiff is unable to perform any past relevant work.  *Id.*  The ALJ further determined that plaintiff is capable of performing a significant number of jobs in the national economy including jobs as a fast-food worker, maid or housekeeper, and light inspector.  *Id.*  Accordingly, the ALJ concluded that plaintiff is not disabled under the Act.  (Tr. 19).

Plaintiff's request for review by the Appeals Council was denied (Tr. 1-5), making the decision of the ALJ the final administrative decision of the Commissioner.

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).

The Court's sole function is to determine whether the record as a whole contains substantial

evidence to support the Commissioner's decision. The Commissioner's findings stand if they

are supported by "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated

Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's

findings are supported by substantial evidence, the Court must consider the record as a whole.

*Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for DIB, plaintiff must meet certain insured status requirements, be under age

65, file an application for such benefits, and be under a disability as defined by the Social

Security Act. 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two

findings. First, plaintiff must suffer from a medically determinable physical or mental

impairment that can be expected to result in death or that has lasted or can be expected to last for

a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the

impairments must render plaintiff unable to engage in the work previously performed or in any

other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

To qualify for SSI, plaintiff must file an application and be an "eligible individual" as

defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon

disability, income, and other financial resources. 20 C.F.R. § 416.202. To establish disability,

plaintiff must demonstrate a medically determinable physical or mental impairment that can be

3

expected to last for a continuous period of not less than twelve months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 (Litsting). If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981).

The Commissioner is required to consider the individual's impairments in light of the Listing of Impairments. 20 C.F.R. Part 404, Subpart P, Appendix 1. The Listing sets forth certain impairments which are presumed to be of sufficient severity to prevent the performance

4

of work. 20 C.F.R. § 404.1525(a). If the individual suffers from an impairment which meets or equals one set forth in the Listing, the Commissioner renders a finding of disability without consideration of the individual's age, education, and work experience. 20 C.F.R. § 404.1520(d); *Kirk*, 667 F.2d at 528.

An impairment can be considered as not severe only if the impairment is a "slight abnormality" which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience. *Farris v. Sec'y of HHS,* 773 F.2d 85, 90 (6th Cir. 1985) (citation omitted); *see also, Bowen v. Yuckert,* 482 U.S. 137 (1987).

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984) (per curiam). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie

5

case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner*, 587 F.2d at 323.  *See also Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987).

When the grid is not applicable, the Commissioner must make more than a generalized finding that work is available in the national economy; there must be "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform *specific* jobs." *Richardson* v. *Secretary of H.H.S.*, 735 F.2d 962, 964 (6th Cir. 1984) (per curiam) (emphasis in original); *O'Banner* v. *Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978).  When the grid is inapplicable, the testimony of a vocational expert is required to show the availability of jobs that plaintiff can perform. *Born v. Secretary of H.H.S.*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Varley* v. *Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987).

At Step 5 of the sequential evaluation process, the burden shifts to the Commissioner "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Jones v. Commissioner of Social Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).  The Commissioner may meet his burden of identifying other work the claimant can perform through reliance on a vocation expert's testimony to a hypothetical question.  To constitute substantial evidence in support of the Commissioner's burden, the hypothetical question posed to the vocational expert must accurately reflect the claimant's mental and physical limitations. *Ealy v. Commissioner of Social Security*, 594 F.3d 504, 516 (6th Cir. 2010); *Howard v. Commissioner of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002); *Felisky* v. *Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).  However, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of H.H.S.*, 39 F.3d 115, 118 (6th Cir. 1994).

It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 247 (6th Cir. 2007) (citations omitted). In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001); *Kirk,* 667 F.2d at 538. "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036. The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985) (citing *Zblewski v. Schweiker,* 732 F.2d 75, 78 (7th Cir. 1984)).

The ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility." *Rogers,* 486 F.3d at 247. Rather, such determination must find support in the record. *Id.* Whenever a claimant's complaints regarding symptoms or their intensity and persistence are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record." *Id.* The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record. *Id.* Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant while inconsistency, although not necessarily defeating, should have the opposite effect. *Id.*

7

### MEDICAL RECORD

Plaintiff was examined by consulting licensed psychologist, Dale Seifert, M.S. Ed., on November 28, 2003. (Tr. 213-17). At that time, plaintiff had been prescribed Effexor, but there was no history of psychiatric hospitalization. She had not had any recent counseling. Mr. Seifert diagnosed plaintiff with dysthymic disorder, generalized anxiety disorder, and alcohol abuse with reported two years of sobriety. Mr. Seifert found mild to moderate limitations. (Tr. 217).

In December 2003, a state agency reviewing psychologist found plaintiff would have moderate difficulties in maintaining concentration, persistence or pace. (Tr. 229).

Plaintiff was examined by consultative physician, Ali G. Arani, M.D., on February 2, 2004. (Tr. 235-40). Plaintiff reported that she was diagnosed with high blood pressure three months prior and was prescribed medication; however, she had not yet taken it due to lack of insurance and an inability to pay for it. (Tr. 235). Dr. Arani reported that plaintiff's gait and extremities were normal and there was no evidence of any arthritic changes affecting any joints. (Tr. 236). Plaintiff had full and intact range of motion in all her joints. *Id.* There was no evidence of sensory changes, muscle wasting, rigidity, or tremor. *Id.* She was right-handed and was able to grasp normally. *Id.* Dr. Arani noted that plaintiff had "symptoms of out of control diabetes." *Id.* Dr. Arani diagnosed non-insulin dependent diabetes and hypertension, neither having caused any end organ damage. *Id.* Dr. Arani opined that plaintiff had no sitting, standing, or walking restrictions. *Id.*

The record contains treatment notes from internist, Jyoti Mehta, M.D., dated August 2005 through November 2006. (Tr. 260-63, 334-35). Dr. Mehta's office notes show complaints of

8

headaches, ears ringing, left foot swelling, and lightheadedness. (Tr. 260, 262). Dr. Mehta treated plaintiff with medication. (Tr. 260, 262, 334-35).

On March 4, 2006, plaintiff was admitted to Mercy Hospital-Anderson presenting with right-sided weakness. (Tr. 241-58). Upon examination, she exhibited weakness of her lower right cranial 7 nerve and slight weakness of grip on the right side. (Tr. 250). An EKG was done which revealed sinus tachycardia at a rate of 106 beats per minute. (Tr. 256). During her hospitalization, she was evaluated by Dr. Mehta, who noted positive Romberg signs, very unsteady ambulation, right-sided facial weakness, right arm weakness, brisk deep tendon reflexes to the right side, and trouble walking a straight line. (Tr. 248-49). He diagnosed acute transient ischemic attack with right-sided hemiparesis; acute cerebrovascular accident with right-sided hemiparesis; uncontrolled diabetes; and hypertension. *Id.* While hospitalized, plaintiff was examined by neurologist, James Anthony, M.D. (Tr. 246-47). Dr. Anthony found a drift of the arm and decreased right hand grip on motor testing, reduced reflexes, absent at the ankle jerks, and upgoing plantar response on the right and downgoing on the left. (Tr. 247). Sensory exam revealed mild sensory changes in the lower extremities consistent with a polyneuropathy probably secondary to diabetes. *Id.* Dr. Anthony concluded that plaintiff may have a mild sensory diabetic neuropathy and clearly had an ischemic event in the left middle cerebellar artery distribution, almost certainly a small vessel infarction related to her hypertension and diabetes. *Id.* Plaintiff was discharged the following day with medications and instructions for follow-up as an outpatient. (Tr. 241-45).

Plaintiff was evaluated by consulting psychologist, Richard Sexton, Ph.D., on June 20, 2006. Dr. Sexton opined that plaintiff appeared capable of attending to her personal care and she

9

told him she was able to do some cooking, cleaning, laundry, and grocery shopping. (Tr. 266-67). She claimed to socialize infrequently, but did have one or two friends. She watched television and had hobbies. Dr. Sexton diagnosed plaintiff with dysthymic disorder. (Tr. 268). Dr. Sexton opined that plaintiff was capable of performing simple repetitive-type tasks and able to understand, recall, and carry out simple instructions. He opined that plaintiff's ability to interact with other people (including co-workers and supervisors) and her ability to tolerate daily stress and the pressures of a work environment was fair. (Tr. 269).

In July 2006, a state agency reviewing psychologist, John Waddell, Ph.D., found moderate restriction of activities of daily living; moderate difficulties in maintaining concentration, persistence or pace; moderately limited ability to work in coordination with or proximity to others without being distracted by them; moderately limited ability to complete a normal workday and work week without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and moderately limited ability to interact appropriately with the general public. (Tr. 281, 285, 286). Dr. Waddell concluded that, as to understanding and memory, plaintiff would be able to carry out simple one to two step instructions as shown by her ability to cook and clean. (Tr. 287). As to concentration and persistence, plaintiff would be able to maintain attention for simple work as shown by her ability to complete testing at the consultive examination. *Id.* As to social interaction, plaintiff would be able to interact with coworkers on a superficial basis as shown by her ability to relate to the examiner. *Id.* As to adaptation, plaintiff would be able to adapt to change. *Id.* Dr. Waddell found that plaintiff's statements are credible. *Id.*

Plaintiff was examined by consultative physician, Damian Danopulos, M.D., on October 19, 2006. (Tr. 289-97). Plaintiff reported that she was diagnosed with diabetes 10 years prior. (Tr. 289). She took anti-diabetics and checked her blood sugar once a day until summer, due to the cost of the strips. *Id.* She complained of blurred vision, headaches, and hearing problems. (Tr. 289-90). Plaintiff also complained of pain in both hands, mostly the 3rd and 4th fingers of the right hand and in the thumb of the left hand. (Tr. 290). There were no other abnormalities in her hands. *Id.* Dr. Danopulos reported that plaintiff had a normal gait and full range of motion in her upper and lower extremities. (Tr. 292). Both thumbs were painful to palpation. *Id.* There was no evidence of joint abnormalities. *Id.* Musculoskeletal examination revealed a normal gait; normal bilateral straight leg raising; painless lumbosacral spine motions; and normal toe and heel gait. Dr. Danopulos also reported that plaintiff's neurological functions were normal and there was no evidence of nerve root compression or peripheral neuropathy. *Id.* Clinical examination revealed normal deep tendon reflexes and no evidence of diabetic neuropathy in either her hands or feet, despite her reports of pain upon hand palpations. *Id.* According to Dr. Danopulos, plaintiff's visual acuity was not good but she was not wearing glasses. *Id.* Plaintiff could hear normal conversational voices. (Tr. 293). Dr. Danopulos opined that plaintiff's ability to perform work-related activities was negatively affected by her very early arthritis in her thumbs and her non-insulin dependent diabetes. *Id.* He also noted a history of mini-stroke without any current neurologic pathology. *Id.*

In November 2006, a state agency reviewing physician, Teresita Cruz, M.D., opined that plaintiff could occasionally lift 50 pounds and frequently lift 25 pounds. (Tr. 300). Plaintiff could stand/walk or sit about 6 hours in an 8-hour workday. *Id.* She had an unlimited ability to

11

push and/or pull. *Id.* She had no postural limitations. (Tr. 301). Her ability for fine
manipulation was limited by early arthritis. (Tr. 302). Dr. Cruz felt that plaintiff was capable of
frequent, but not constant, fine manipulation. *Id.* In April 2007, W. Jerry McCloud, M.D.,
another state agency reviewing physician, affirmed Dr. Cruz's opinion. (Tr. 298).

Plaintiff treated with Shelley Stanforth, M.D., between May and August 2007. (Tr.
307-22). The record reflects that Dr. Stanforth treated plaintiff for diabetes and back pain. *Id.*
Examinations generally revealed no objective abnormalities. (Tr. 310, 314-15, 318, 321). Dr.
Stanforth diagnosed depression and type 2 diabetes. She counseled plaintiff and prescribed
medication. (Tr. 321). Dr. Stanforth noted in July 2007, that plaintiff did well with her
anti-depressants. Her blood pressure was under good control with medication and her diabetes
mellitus was stable. (Tr. 318-19). In August 2007, plaintiff complained of back pain. Range of
motion of the cervical and thoracic spines was normal. Range of motion of the lumbosacral
spine was globally decreased due to pain with some bilateral paraspinal tenderness. Plaintiff's
neurological exam was normal. Dr. Stanforth prescribed rest, ice, compression and elevation and
the use of over the counter analgesics or anti-inflamatories. Dr. Stanforth did not think x-rays
were necessary. (Tr. 310). Dr. Stanforth reported that plaintiff's diabetes was controlled. (Tr.
315).

Plaintiff was seen by Dr. A. Johnson on between February 2008 and July 2008. (Tr. 324-
32). Dr. Johnson's notes are largely illegible.

In June 2008, plaintiff presented to the emergency room for persistent vomiting. (Tr.
353-64). She reported that she had not been testing her blood sugar because of a broken
glucometer. (Tr. 355). She was diagnosed with hyperglycemia. (Tr. 361).

12

The record shows that plaintiff began counseling at Clermont Counseling in June 2008. (Tr. 350-51). Treatment notes reveal that plaintiff's symptoms including increased irritability and nervousness, tearfulness, mood swings, difficulty sleeping, paranoid feelings, and excessive worry. (Tr. 345, 346, 349, 350).

In September 2008, plaintiff was evaluated by optometrist, Michelle Howell, M.D. (Tr. 337-38). Dr. Howell reported that plaintiff had 20/40 vision in the right eye and 20/70 in the left eye. (Tr. 337). Dr. Howell diagnosed "PDR" (Proliferative Diabetic Retinopathy), worse in the left eye. *Id.*

On September 16, 2008, the day before the ALJ hearing, plaintiff underwent electromyography (EMG) studies of the upper and lower extremities. (Tr. 340-41). The testing of the upper extremities was consistent with bilateral carpal tunnel syndrome. (Tr. 340). The sensory responses and motor conduction findings in the lower limbs were consistent with peripheral neuropathy, most likely related to diabetes. *Id.*

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified at the administrative hearing that she can no longer work due to diabetes, which is causing vision problems and problems with her hands. (Tr. 34). Plaintiff also testified that she has trouble lifting and holding things, often drops things, and has trouble picking things up. *Id.* She also reported problems with numbness in her legs and swelling in her right foot, affecting her ability to stand for very long. *Id.* She testified that she is also losing her hearing in her left ear. (Tr. 35). Plaintiff testified that she had recently been treated at the emergency room for nausea. (Tr. 36). Her medications included insulin, Formatin, Lisinopril,

13

and Cymbalta. (Tr. 37). She reported that her medications helped for the most part, but made her tired. *Id.*

Plaintiff testified that she had not been prescribed hearing aids or glasses, but that she used store-bought glasses. (Tr. 41). She testified that she was stressed, which made it difficult for her to function and concentrate. (Tr. 42-43).

As to her daily activities, plaintiff testified that on a bad day, which she had five to seven days a week, she would do little more than lie down. (Tr. 43). On a good day, she cleaned her house and played games with her daughter. *Id.* Plaintiff reported that stress makes it difficult for her to function and concentrate on a daily basis. (Tr. 42-43, 53). She can only concentrate for 15 minutes at a time. Plaintiff testified that she wiped counters, vacuumed, made sandwiches or small meals, loaded and unloaded the dishwasher, and put clothes in the dryer. (Tr. 44-45). She took public transportation. (Tr. 46). She went to the grocery store with her mother. (Tr. 45). She tried to attend her daughter's kindergarten functions. (Tr. 50-51).

Plaintiff estimated that she could not lift more than five pounds. She could sit for 15 minutes and then had to stand for 15 to 20 minutes. (Tr. 39). She estimated that she could walk for half a block or about five minutes. *Id.* She reported that she had trouble gripping items because of the swelling and pain in her hands. (Tr. 40). She had trouble buttoning or zipping clothes and holding a telephone. *Id.*

Plaintiff testified that when she was working, on average, she missed two to three days of work a month due to her medical conditions. (Tr. 53).

14

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The VE classified plaintiff's past relevant work as a dump truck driver as medium and unskilled; school bus driver as medium and semi-skilled; and cashier as light and unskilled. (Tr. 58). The ALJ asked the VE to consider an individual who could perform work at the medium exertional level limited to occasional fine manipulation bilaterally, and work that is limited to simple, routine, and repetitive tasks performed in a low-stress work environment and occasional interaction with the public and coworkers. (Tr. 59). Based on this hypothetical, the VE testified that such an individual could perform her past work as a dump truck driver and school bus driver. *Id.* Plaintiff interrupted the VE and said because she is an insulin-dependent diabetic, she cannot qualify for a CDL (commercial driver's license) and would be unable to perform these jobs. (Tr. 60). The VE later confirmed that because plaintiff is an insulin-dependent diabetic, she would be unable to perform these jobs. (Tr. 65).

The ALJ next asked the VE to consider an individual with the same limitations as above except that she is limited to light work. (Tr. 60). Based on this hypothetical, the VE testified that such an individual could not perform plaintiff's past work. *Id.* However, the VE testified that there would be light, unskilled work including jobs as a fast-food worker, maid, housekeeper, cleaner, and inspector, tester, sorter, and weigher jobs. (Tr. 61).

The ALJ further asked the VE to consider the above hypothetical, with additional limitations including occasional gross manipulations, occasional foot controls, and a sit/stand option. (Tr. 61). The VE testified that this would eliminate the fast-food worker job, cleaning job, the maid and housekeeper job, and the inspector, tester, sorter, and weigher jobs. (Tr. 61-62). The VE further testified that limitations in gross manipulation skills are very limiting in

15

terms of what jobs a person can perform. (Tr. 62). The alternate sit/stand option would eliminate light jobs for the most part. *Id.* Plaintiff could perform the sedentary jobs of protective service worker and surveillance system monitor. *Id.*

On cross-examination, the VE testified that a person could not miss work more than one day a month and still be employable. (Tr. 64). Based upon plaintiff's testimony, the VE testified that there would not be jobs that she could perform on a 40-hour work week basis. *Id.* The VE also testified that in order to perform sedentary work a person must frequently use the hands. (Tr. 65).

## OPINION

Plaintiff assigns two errors in this case. First, plaintiff contends the ALJ ignored the VE's testimony that plaintiff would not be able to perform any jobs based on her hand limitations. Second, plaintiff argues the ALJ erred in finding that plaintiff is not credible. For the reasons that follow, the Court determines the decision of the ALJ is supported by substantial evidence and should be affirmed.

Plaintiff's first assignment of error asserts that "[t]he ALJ ignored VE testimony that Plaintiff would not be able to perform any jobs based on her hand limitations." (Doc. 10 at 8). Plaintiff states that the "VE testified that there were no jobs Plaintiff could perform based on her hand limitations." (Doc. 10 at 8). Plaintiff asserts that "the VE agreed that Plaintiff had no good use of her hands and would need [the] frequent ability to use her hands for sedentary work." (Doc. 10 at 10). Plaintiff argues that the ALJ's hypothetical question to the VE failed to accurately portray plaintiff's hand limitations and was therefore erroneous. (Doc. 10 at 10).

16

The first assignment of error should be overruled. First, plaintiff mischaracterizes the VE's testimony. Contrary to plaintiff's representation, the VE did not agree "that Plaintiff had no good use of her hands." Rather, the VE responded "yes" to the question, "And would you agree that *based on her testimony* she does not have good use of her hands?" (Tr. 65) (emphasis added). Implicit in counsel's question was a limitation on hand movements based on plaintiff's own description of her limitations. The VE's affirmative response was not an "expert" or medical determination that plaintiff's physical impairments somehow limited her ability to use her hands. The VE is not a medical expert and may not give a medical opinion on a claimant's physical or mental limitations. Instead, the VE's role is to provide expert testimony on the types and number of jobs an individual can perform based on that person's RFC, age, education, and work experience. *See Webb v. Commissioner*, 368 F.3d 629, 633 (6th Cir. 2004) ("The vocational expert is not expected to evaluate the claimant's medical conditions in making this determination. Indeed, vocational experts are not required to have any medical training, so any evaluation of medical evidence they perform would be outside their area of expertise."). Thus, to the extent plaintiff suggests the VE's testimony supports her contention that she is more limited in her ability to use her hands than the ALJ found, this assignment of error is without merit.

Plaintiff also contends the ALJ erred because he failed to find plaintiff "does not have frequent ability to use her hands." (Doc. 10 at 10). Plaintiff argues the ALJ did not consider the findings in the record which corroborate plaintiff's pain and hand limitations. Plaintiff cites to evidence of bilateral hand pain and problems with plaintiff's fingers locking up (Tr. 290); poor fine and gross motor skills due to numbness and swelling in plaintiff's hands (Tr. 215); pain in both thumbs and hands with palpation (Tr. 292, 293); and complaints of pain in both hands,

17

mostly the 3rd and 4th fingers of the right hand. (Tr. 290). Plaintiff also cites to Dr. Anthony's March 2006 consulting neurology report which noted sensory changes and reduced grip in plaintiff's right hand. (Doc. 16 at 2).

Plaintiff's reliance on the above cited evidence is misplaced. The reported "findings" cited in Dr. Danopulos's report (Tr. 290, 292, 293) are based on plaintiff's *own* subjective reports of her pain and limitations to Dr. Danopulos. With the exception of a finding of pain on palpation of the hands (Tr. 293), none of the "findings" cited by plaintiff are based upon Dr. Danopulos's clinical examination. (Tr. 290, 292, 293). *See* 20 C.F.R. § 404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled").

Plaintiff also cited to a "finding" that she has "poor fine and gross motor skills due to numbness and swelling" in her hands. (Doc. 16, citing Tr. 215). This "finding" is found in Mr. Seifert's consultative psychological report and does not corroborate plaintiff's claim of a disabling hand impairment. Again, this evidence is based on plaintiff's self-reporting to Mr. Seifert during plaintiff's *mental status* examination, and not as the result of a physical examination or clinical testing. (Tr. 215). It is not corroborative clinical evidence supporting her claim that she does not have the frequent ability to use her hands. *See Craig v. Chater*, 76 F.3d 585, 590 n. 2 (4th Cir. 1996) (physician's observations regarding claimant's subjective complaints of pain do not constitute "clinical evidence").

Lastly, while Dr. Anthony reported "right hand grip is less than the left in a right handed person" and "mild sensory changes in the lower extremities" (Tr. 247), such findings were related to the mild stroke plaintiff had just sustained in March 2006. *Id*. Dr. Anthony noted plaintiff was improving at the time of his examination and, as the ALJ's decision reflects, seven

18

months later Dr. Danopulos reported no current neurologic pathology following plaintiff's mini-stroke. (Tr. 16, 293).

In determining plaintiff had an RFC for work not involving more than occasional bilateral fine manipulation, the ALJ noted that Dr. Danopulos's clinical findings indicate plaintiff was not as limited as she claimed. Plaintiff's grasp, manipulation, pinch and fine coordination were rated as normal bilaterally. (Tr. 294). While plaintiff's hand were painful on palpation, no other abnormalities were found. (Tr. 293). Examination also revealed normal range of motion in her hands and fingers and normal hand function bilaterally. (Tr. 296). In addition, four months before Dr. Danopulos's October 2006 examination, plaintiff reported to Dr. Sexton that her hobbies included embroidery, doing crafts, and making wreaths (Tr. 267), which did not suggest significant manipulative limitations at that time. As the ALJ acknowledged, the September 2008 EMG findings lend some credibility to plaintiff's hand complaints. (Tr. 16). However, the EMG report, aside from confirming a diagnosis of carpal tunnel syndrome, does not specify the severity of the condition nor suggest any particular limitations on plaintiff's ability to use her hands. "[T]he mere diagnosis of an impairment does not render an individual disabled nor does it reveal anything about the limitations, if any, it imposes upon an individual." *McKenzie v. Commissioner*, No. 99-3400, 2000 WL 687680, at *5 (6th Cir. May 19, 2000) (citing *Foster v. Bowen*, 853 F.2d 488, 489 (6th Cir. 1988)). In addition, no physician has opined that plaintiff's hand impairment is as limiting as described by plaintiff. While the state agency medical consultants opined that plaintiff could "frequently" perform fine manipulation with her hands based on Dr. Danopulos's assessment that plaintiff had early arthritis in her hands, the ALJ reasonably determined that limiting plaintiff to the exertional demands of light work with a

19

reduction of fine manipulation from "frequent" (as found by the state agency doctors) to "occasional" fine manipulation adequately accommodated plaintiff's hand impairment. (Tr. 16). In the absence of clinical findings corroborating plaintiff's allegations of an inability to use her hands frequently, the ALJ's decision limiting plaintiff to occasional fine manipulation is substantially supported by the record and the hypothetical question to the VE based thereon was not erroneous.

Plaintiff's second assignment of error asserts the ALJ erred in his credibility finding. The ALJ determined that plaintiff's statements concerning the intensity, persistence, and limiting effects of her alleged symptoms are not credible to the extent they conflicted with the ALJ's RFC finding. (Tr. 17).

Plaintiff asserts: (1) the ALJ improperly cited noncompliance with treatment as a factor when plaintiff's noncompliance was based on her lack of insurance; (2) the ALJ failed to consider the EMG findings, the VE testimony, and Dr. Anthony's clinical findings which support plaintiff's testimony that she can lift only five pounds, stand no longer than 15 to 20 minutes, and frequently drops things; and (3) the ALJ's reliance on plaintiff's report of household chores does not equate to her ability to work on a regular and continuing basis. (Doc. 10 at 11).

First, contrary to plaintiff's contention, the ALJ did not discredit plaintiff based on noncompliance with medical treatment. While the ALJ noted a history of poor control of plaintiff's diabetes and high blood pressure due to noncompliance with treatment in connection with his Step 2 severity findings (Tr. 13), a review of the ALJ's decision reflects that noncompliance with treatment was not a factor in determining plaintiff's credibility. (*See* Tr. 17).

20

Second, as discussed above in connection with plaintiff's first assignment of error, the EMG findings, VE testimony, and Dr. Anthony's report were not ignored by the ALJ and, in any event, do not support plaintiff's allegations of an inability to use her hands frequently.

Third, the ALJ's citation to plaintiff's household chores was made in connection with his Listings finding at Step 3 of the sequential evaluation and not as a reason to discredit plaintiff's testimony. The ALJ simply noted that the restrictions on plaintiff's daily living activities were mild and her report of household chores was one factor he considered among several in making this determination. (Tr. 15).

The ALJ's decision sets forth in detail the reasons for his credibility finding. (Tr. 16-17). As the ALJ noted, none of plaintiff's treating doctors reported that plaintiff was disabled or submitted assessments of her physical or mental limitations. (Tr. 16). The ALJ also reviewed in detail the medical findings of record and reasonably concluded that such findings do not support the extreme exertional or manipulative limitations to which plaintiff testified. (Tr. 17). The ALJ further pointed to the inconsistencies between plaintiff's testimony and the record evidence in determining plaintiff was not fully credible. *Id.* In light of the ALJ's opportunity to observe plaintiff's demeanor, the ALJ's credibility finding is entitled to deference and should not be discarded lightly. *Kirk,* 667 F.2d at 538. *See also Walters v. Commissioner*, 127 F.3d 525, 531 (6th Cir. 1997); *Gaffney v. Bowen*, 825 F.2d 98, 101 (6th Cir. 1987). The ALJ's decision reflects that he properly considered the required factors in determining plaintiff's credibility. *See* 20 C.F.R. § 404.1529(c). Accordingly, the Court determines that substantial evidence supports the ALJ's credibility finding in this matter. Therefore, plaintiff's second assignment of error should be overruled.

21

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner be **AFFIRMED** and this case be dismissed from the

docket of this Court.

Date: 2/14/2011

Karen L. Litkovitz
United States Magistrate Judge

22

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ATHENA HOWLETT,　　　　　　　　　　Case No. 1:10-cv-150
　　　　Plaintiff　　　　　　　　　　　　Barrett, J.
　　　　　　　　　　　　　　　　　　　Litkovitz, M.J.

　　　vs

COMMISSIONER OF
SOCIAL SECURITY,
　　　　Defendant

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).